**********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, modifies and affirms the Opinion and Award of the Deputy Commissioner.
 **********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as: *Page 2 
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and are subject to governance by the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the plaintiff and the defendant-employer at all times relevant, herein.
3. The defendant-employer was insured by Liberty Mutual at all times relevant, herein.
4. In addition, the parties stipulated into evidence a packet of medical records and reports.
 EXHIBITS
1. The Pre-Trial Agreement dated June 8, 2006, which was submitted by the parties, is received into evidence.
2. At the hearing, photographs identified as the plaintiff's exhibits one (1) through four (4) were received into evidence, but retained by the plaintiff's counsel to be copied. Those pictures were submitted, but they were marked as the plaintiff's exhibits one (1) through six (6) and included in the record as Exhibit pages 284-295.
 **********
Based upon all of the competent evidence from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff, who was 59 years old at the time of hearing before the Deputy Commissioner, and who has a 12th grade education, began working for the defendant-employer on May 3, 1977. The company produces and bottles soft drinks. In June 2000, the plaintiff's regular *Page 3 
job was depalletizer operator for two lines. The job involved placing full pallets on the line. However, she was also trained to work as a back-up for other positions, including the bag-in-a-box operator, a position which required the operator to fill bags with syrup, drop each bag into a box for that particular flavor, and place the box on the conveyor belt. The bag-in-a-box products were used by restaurants, which mixed the syrup with carbonated water to produce soft drinks.
2. On Saturday, June 24, 2000, the plaintiff was working in the bag-in-a-box position. At some point during her work shift, she needed to flush the line in order to change flavors. During the process, a sight glass in a pipe which carried the syrup blew out of the pipe. It was approximately one and one half (1 ½) feet from her face. The sight glass and syrup struck the plaintiff's right temple and eye area before she could back away. Since she could not see out of her right eye due to the syrup, she used a radio to call for assistance, and a supervisor came to help her. The supervisor guided her to a bathroom where she cleaned her eye and face. She had been coated with syrup, so she also had to clean up, generally, and someone had to bring her a change of clothes.
3. The defendants sent the plaintiff to Prime Care on Monday, June 26, 2000, and Dr. Gasperson evaluated her there. The plaintiff described the incident, which had occurred on Saturday, and reported soreness across the orbit of her right eye. On examination, there was no evidence of corneal abrasion, facial abrasion, or any abnormality in the appearance or function of her eye. Dr. Gasperson reassured her regarding her condition, and did not prescribe any medical treatment. The plaintiff was also allowed to continue working without restrictions.
4. On July 3, 2000, approximately a week later, the plaintiff went to her family physician, Dr. Cooper, with complaints of right ear and eye pain, plus redness and draining of the right eye since the incident at work. Dr. Cooper found evidence of allergy symptoms when he *Page 4 
examined her, but her right eye examination was normal. He prescribed medication for congestion and allergies. The plaintiff next returned to Dr. Cooper on August 15, 2000, reporting that her ear pain was improved, but that she had had some episodes of ringing in the ear. Consequently, he kept her on the allergy medication. By the next follow-up appointment of September 18, 2000, her symptoms had significantly improved, so he released her from follow-up care.
5. The plaintiff continued working at her regular job, and did not report further problems associated with the June 24, 2000 incident until March 30, 2001, when she returned to Prime Care. She told the doctor there that she had been having pain in her right temple, right eye, and right cheek area for nine (9) months since the accident at work. The examination was normal, and the vision in her right eye tested to be 20/20. The Prime Care doctor recommended that she be seen by a neurologist, but made no treatment recommendations, and returned her to work with no restrictions.
6. Although Dr. Jeffrey Jenkins subsequently ordered a CT scan of the plaintiff's brain and facial bones, no medical records from Dr. Jenkins were submitted into evidence. The May 10, 2001 CT scan was essentially normal.
7. The plaintiff's next complaint of facial pain was with Dr. Cooper, whom she saw on August 15, 2001. The plaintiff told him that she had seen a neurosurgeon, who told her that she should see her family doctor. The plaintiff felt that her complaints were not taken seriously, and that she needed to see a neurologist, as well as have a MRI. Dr. Cooper noted that she appeared to have poor insight into how her complaints had been addressed, and what further evaluations should be performed. Although Dr. Cooper had not seen her medical records, since she had reportedly been evaluated by a neurosurgeon, he did not believe a neurological evaluation *Page 5 
would be necessary. Rather, he suggested that she see an oral surgeon. Dr. Cooper noted that the plaintiff was not very receptive to his suggestions.
8. Consistent with Dr. Cooper's impression, the plaintiff subsequently went to Dr. Rosen, another family doctor, on August 24, 2001, as a new patient. Since she was reporting complaints of depression at that time, Dr. Rosen took a psychological history, and learned that she had been through an extremely traumatic event as a 10-year-old child, when her father killed her mother, and her brother killed her father, while she tried to hide and protect her other siblings. She experienced other significant emotional stressors, as well. In addition to her depressive symptoms, she also complained of face, jaw, and neck pain, which she attributed to the incident at work on June 24, 2000. There were no abnormalities on examination, and Dr. Rosen was unable to determine whether there was any anatomical pathology present, or if the complaints were work-related. However, it was his opinion that she had post traumatic stress disorder, which he suspected was the source of her other symptoms besides her depression. He prescribed an anti-depressant, and advised her to see a dentist regarding possible temporomandibular joint (TMJ) problems.
9. The plaintiff subsequently returned to Dr. Rosen on September 21, 2001 and October 22, 2001. At the October appointment, she indicated that her facial symptoms were the same, but that she had not seen a dentist or an oral surgeon, despite his prior recommendation. She also asked the Dr. Rosen to take her out of work for at least two (2) months, so that she could get herself "straightened out." Dr. Rosen would not agree to take her out of work for such a long time, but considered offering her a short period out of work for psychological treatment. The plaintiff was not receptive to his suggestion. Nevertheless, he recommended that she see a psychologist and an oral surgeon. *Page 6 
10. In the next two (2) months, the plaintiff saw an ophthalmologist, who found no evidence of eye injury. She also saw an ear, nose, and throat specialist, who initially thought her complaints of tinnitus were probably due to sensorineural hearing loss, although her audiogram was normal, except for a small dip in both ears at 4000 hertz. Her ear examination was normal, as well. Neither physician found objective evidence of injury to the plaintiff's face, head, or neck.
11. On January 21, 2002 the plaintiff began receiving treatment from Dr. Edward Hill, a neurologist. She advised him that she had been having headaches, facial pain, memory problems, speech problems, hearing problems, blurred vision, numbness, and problems with balance since the June 24, 2000 injury. Based upon her description, and without reviewing the prior medical records, Dr. Hill diagnosed the plaintiff with post-concussive syndrome, as well as depression, tinnitus, possible hearing dysfunction, and occipital neuralgia. He performed a trigger point injection, and ordered various diagnostic tests, all of which proved to be either within normal limits or non-diagnostic for problems associated with the alleged work injury in question. However, MRI's revealed degenerative disc disease in her cervical and lumbar spine, and an EMG showed evidence of some nerve root irritation at L5 on the left side. These conditions were not related to her alleged work injury. Dr. Hill continued to treat the plaintiff with trigger point injections and various medications. Her symptoms persisted despite the treatment provided.
12. In August 2002, the plaintiff finally went to a dentist, who referred her to Dr. Whitehouse, an oral surgeon, to evaluate her regarding possible TMJ problems. Dr. Whitehouse examined the plaintiff on September 9, 2002, and found no significant abnormalities. He thought that she had myalgia of the right masseter muscle, and suggested that she be evaluated by Dr. Zuniga, an oral surgeon in Chapel Hill, who was considered to be an expert in facial pain. Dr. Whitehouse also asked Dr. Hill to obtain an MRI of her jaw. *Page 7 
13. Dr. Hill ordered the MRI of the plaintiff to evaluate her for TMJ, but it proved to be normal. The plaintiff was then evaluated by Dr. Quadland, another oral surgeon. He reviewed the MRI and x-rays, examined the plaintiff, but also found no abnormalities.
14. Because of the plaintiff's complaints, Dr. Hill subsequently took her out of work for a period of time from January 21, 2002 until April 1, 2002, and during several periods in 2003. He also referred her to Dr. Zuniga, who evaluated her on June 10, 2003. The history recorded by Dr. Zuniga contains information which the plaintiff probably could not have provided, so it appears that he reviewed prior medical records. Although the plaintiff complained of cracking and popping in her TMJ area, as well as swelling over her eye, Dr. Zuniga found no evidence of those symptoms on examination. He looked for neurologic, inflammatory, neoplastic, infectious, dental, salivary, and TMJ sources of pain, but her examination was normal, with no objective findings of abnormality.
15. Dr. Zuniga concluded that the plaintiff might have myalgia or muscle pain, based solely upon her history. However, Dr. Zuniga opined that if the plaintiff did have myalgia, it was mild, and would not be associated with the June 24, 2000 incident. He was of the opinion that the myalgia might be due to stress or anxiety, which could lead to clenching or overactivity of the jaw. Dr. Zuniga told the plaintiff what the various treatment options were for a myalgia condition, assuming that she might have it.
16. Next, the plaintiff returned to Dr. Hill for further treatment. Dr. Hill felt that her symptoms, which he diagnosed as atypical facial pain syndrome, were due to injury to the trigeminal nerve. The plaintiff also developed some intermittent ptosis involving her right eye, for which Dr. Hill performed a blink reflex study. However, he did not relate the ptosis to the June 24, 2000 incident. *Page 8 
17. On October 12, 2003, Dr. Hill determined that the plaintiff reached maximum medical improvement, and he rated her with a 20 percent permanent partial impairment to her whole body. He and his staff continued to see the plaintiff periodically after that date to prescribe medication and to perform trigger point injections.
18. On July 30, 2004, Dr. Hill's physician's assistant saw the plaintiff for left buttock and leg pain, which she attributed to a fall at home in 2002. He ordered a MRI, which revealed disc bulges or protrusions at three (3) levels of her lumbar spine with for aminal stenosis at two (2) of those levels. Dr. Hill then saw her on August 20, 2004 and performed nerve testing, which did not show signs of nerve root impingement in the left leg. Additionally, he ordered physical therapy.
19. Two (2) days after the MRI, the plaintiff sustained another injury at work. She was sent to work on the can line on August 4, 2004. As was her usual practice, she returned from lunch early and resumed her work duties. Thinking that the filler operator was still at lunch, she climbed up onto the equipment so that one (1) foot was on the conveyor belt and the other was on a pallet. While she was standing in that manner, the filler operator, not knowing she was there, briefly started the equipment twice. The plaintiff twisted around when the conveyor belt moved and hurt her right knee.
20. The defendant-employer sent the plaintiff to Prime Care for this knee injury on August 7, 2004. Although she complained of terrible pain and giving way of the right knee on that occasion, the physician's assistant who examined her noted that her gait was normal, and that she had full range of motion of the knee. The plaintiff's condition was diagnosed as a knee sprain. She was given medication and restricted to light duty. When the plaintiff returned to Prime Care *Page 9 
on August 11, 2004, she reported that her symptoms improved, and that she was performing her regular job duties without problems. Thus, she was released from medical care.
21. The plaintiff did not request further treatment for her right knee injury until December 2004. She went back to Prime Care on December 13, 2004 at which time she complained of pain in both of her legs, ankles, and feet, and in her right knee. The physician's note was difficult to decipher, but it appeared that the diagnosis was polyarthralgias. The physician prescribed anti-inflammatory medication and gave the plaintiff work restrictions. She returned for follow-up care on December 29, 2004, on January 6, 2005, and on January 12, 2005. Laboratory testing revealed that she had an elevated sedimentation rate, so Dr. O'Meara recommended that the plaintiff see her family doctor for follow-up regarding a possible arthritic condition. On January 12, 2005, her symptoms were much better, and so the physician's assistant released her from care. However, she was again advised to see her family doctor for further problems, inasmuch as it did not appear that her general complaints were related to the August 4, 2004 injury. The plaintiff subsequently returned to the clinic once more on February 28, 2005, reporting that she was having ongoing symptoms, which her family doctor did not think were due to arthritis. Dr. O'Meara examined her, noting that she had a normal gait, and that her lower extremities were normal in appearance, with no swelling, redness, or laxity, and with full and active range of motion. Dr. O'Meara concluded that her symptoms were not work-related and gave her a return to work note with no work restrictions.
22. In early 2005, the plaintiff continued to see Dr. Hill for treatment. Dr. Hill's letter dated January 31, 2005 suggested that fibromyalgia might be a possibility. On February 23, 2005, the plaintiff returned to Dr. Hill, this time complaining of neck stiffness, as well as right jaw and neck pain. Her EEG was normal. Dr. Hill provided additional treatment. *Page 10 
23. In February 2005, the plaintiff received treatment at Wake Forest University Family Physicians, and then underwent a rheumatoid work-up on March 21, 2005, which was negative.
24. The defendants paid for some medical treatment arising from both of the injuries in question. However, they have denied that the plaintiff is entitled to further benefits under the Workers' Compensation Act.
25. On June 24, 2000 the plaintiff sustained an injury by accident arising out of and in the course of her employment with the defendant-employer. The fact that the sight glass blew out of the syrup line and struck her on the right eye and temple area constituted an unusual occurrence, which interrupted her regular work routine. However, when the plaintiff presented for examination two (2) days later, there were no abrasions to her cornea or face, or any other indications of injury. When her own doctor examined her a week after that evaluation, there was no indication of trauma to her head, eyes, or ears. Rather, her symptoms suggested seasonal allergies. During the next couple of months, the plaintiff reported minimal symptoms and she did not seek further treatment until the following March 2001. Despite batteries of tests, no objective signs of a physical problem associated with the injury were ever found, and Dr. Zuniga, a specialist in facial pain, indicated that, based solely on what she told him, the only condition she might have would be muscle pain, but that type of problem would be very self-limiting. Furthermore, the time delay before the symptoms developed does not support a correlation between the June 24, 2000 injury and the complaints, as the plaintiff did not begin to seek treatment until March 2001. Although Dr. Zuniga did testify that if a correlation was established between the time of the June 24, 2000 injury and time of the onset of facial pain, blunt trauma to *Page 11 
the face, would in his opinion, be a significant contributing factor to the plaintiff's facial pain, no such correlation was, in fact, established.
26. The greater weight of the credible evidence establishes that the symptoms of which the plaintiff complained beginning in March 2001 were not a proximate result of the injury by accident of June 24, 2000. Dr. Hill's opinions regarding causation are not given as much weight because they were based upon what the plaintiff told him, which does not appear to be factually accurate, and he did not appear to settle on a specific diagnosis of what the plaintiff's condition was. In addition, Dr. Hill did not review the plaintiff's prior medical records when he related the June 24, 2000 injury to her subjective complaints.
27. Although the defendants reasonably authorized additional medical evaluation in March 2001 when the plaintiff complained of further problems, the medical treatment she received thereafter did not tend to effect a cure, give relief, or lessen any disability associated with the June 24, 2000 injury by accident. Further, the plaintiff did not miss more than a few hours of work due to the June 24, 2000 injury. The periods she was out of work at Dr. Hill's recommendation were due to problems which were not proven to have been a proximate result of this injury. Except for those periods when she was excused from work by Dr. Hill, the plaintiff continued to work for the defendant-employer up to the date of the hearing.
28. The plaintiff sustained no permanent partial disability as a result of the June 24, 2000 injury by accident. The 20 percent whole body impairment rating given by Dr. Hill was not reasonably related toeither of the plaintiff's work-related injuries.
29. On August 4, 2004, the plaintiff sustained another injury by accident arising out of and in the course of her employment with the defendant-employer. The fact that the conveyor belt moved while she was standing on it, causing her to twist around, constituted an unusual *Page 12 
occurrence which interrupted her regular work routine. As a result of the accident, the plaintiff sprained her right knee. The defendants provided medical treatment after this injury. The plaintiff was restricted to light-duty work for several days, but apparently worked all but one day. Thereafter, she sustained no further disability as a result of the knee injury.
30. The plaintiff had pre-existing degenerative disc disease in her lumbar spine, which was causing symptoms in her left leg before her second injury at work. The evidence did not establish that the pre-existing back condition was materially aggravated by the twisting incident on the conveyor belt. The bilateral leg complaints of which the plaintiff complained in December 2004, which were diagnosed as polyarthralgias, were not proven to have been a proximate result of the injury by accident on August 4, 2004. The plaintiff required no further treatment for her knee sprain besides the treatment already provided by the defendants.
31. The plaintiff did not sustain any permanent partial disability as a result of the August 4, 2004 injury by accident.
 **********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. (I.C. 169032) On June 24, 2000 the plaintiff sustained an injury by accident arising out of and in the course of her employment with the defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. (I.C. 169032) The plaintiff did not prove, by the greater weight of the credible evidence, that the conditions for which she was treated, beginning in March 2001, were a proximate result of the June 24, 2000 injury by accident. Click v. Pilot Freight Carriers, Inc., *Page 13 300 N.C. 164, 265 S.E.2d 389 (1980); Anderson v. Northwestern MotorCompany, 233 N.C. 372, 64 S.E.2d 265 (1951).
3. (I.C. 169032) Since the plaintiff's disability associated with her June 24, 2000 injury was less than seven (7) days, she is not entitled to compensation for temporary total disability. N.C. Gen. Stat. § 97-28;Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980).
4. (I.C. 169032) Having sustained no permanent partial disability as a result of the June 24, 2000 injury by accident, the plaintiff is not entitled to compensation for this accident. N.C. Gen. Stat. § 97-31.Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980).
5. (I.C. 169032) The plaintiff is entitled to have the defendants provide all medical compensation arising from this injury by accident. However, since the conditions for which she was treated beginning in March 2001 were not proven to have been a proximate result of the injury at work, she is not entitled to have the defendants provide treatment for those conditions, except for the evaluations and treatment specifically authorized by the defendants to determine whether there was a causal relationship. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-90 (e).
6. (I.C. 457633) On August 4, 2004, the plaintiff sustained an injury by accident arising out of and in the course of her employment with the defendant-employer. N.C. Gen. Stat. § 97-2 (6).
7. (I.C. 457633) The plaintiff did not prove, by the greater weight of the credible evidence, that the conditions for which she was treated, beginning in December 2004, were a proximate result of the August 4, 2004 injury by accident. Click v. Pilot Freight Carriers, Inc., *Page 14 300 N.C. 164, 265 S.E.2d 389 (1980); Anderson v. Northwestern MotorCompany, 233 N.C. 372, 64 S.E.2d 265 (1951).
8. (I.C. 457633) Since the plaintiff's disability associated with this injury was less than seven (7) days, she is not entitled to compensation for temporary total disability. N.C. Gen. Stat. § 97-28; Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
9. (I.C. 457633) Having sustained no permanent partial disability as a result of the August 4, 2004 injury by accident, the plaintiff is not entitled to compensation for this accident. N.C. Gen. Stat. § 97-31.Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980).
10. (I.C. 457633) The plaintiff is entitled to have the defendants provide all medical compensation arising from this injury by accident. However, since the conditions for which she was treated beginning in December 2004 were not proven to have been a proximate result of the injury at work, she is not entitled to have the defendants provide treatment for those conditions, except for the evaluations and treatment specifically authorized by the defendants to determine whether there was a causal relationship. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-90 (e).
 **********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. (I.C. 169032) Except for the medical treatment specifically authorized by the defendants, the plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. (I.C. 457633) Except for the medical treatment specifically authorized by the defendants, the plaintiff's claim for workers' compensation benefits is hereby DENIED. *Page 15 
3. Defendants shall pay the costs.
This the ___ day of May 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/__________________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________________ DANNY LEE McDONALD COMMISSIONER *Page 1